Good afternoon. This is Gregory Ott for Respondent Appellant. I'd like to say at the outset, under the assumption that this Court is bound by H.E.R.D. and as the law of the circuit, I did not intend to reiterate my argument that H.E.R.D. should be overruled or that this Court should do it. What I'd like to focus on instead is invocation and prejudice. But that said, if the Court has any questions about my argument on what's clearly established, I'd be happy to answer. We appreciate the argument, but you also understand we can't overrule another Ninth Circuit case. So why don't you proceed? I do. So H.E.R.D. is distinguishable. In H.E.R.D., H.E.R.D. required and found and expressed an ambiguous invocation of the right to selective silence. And the H.E.R.D., the way they described it is, H.E.R.D. quote, repeatedly refused to perform the demonstration in no uncertain terms. Now here, what happened was Jackson never talked about the details of the offense, but that isn't an unambiguous invocation. The only thing that he says that comes close to that is where he says, and this is early on in the first interview, I'm not going to say nothing. I mean, but then he immediately contradicts that by continuing to talk and eventually submitting to a second interview after waving Miranda. It was also not in response to any specific question. It was in response to a statement, we'd like to catch up with you. So I think whatever clarity it had on its face was eliminated when he just kept talking and contradicted that statement. And it's not clear what he was talking about, especially compared to the invocations in H.E.R.D., which were, as I said, discrete and the topic is clear and the request is clear that I will not do that. So the H.E.R.D. does not, even H.E.R.D., I should say, H.E.R.D. does not support the magistrate judge's finding of an invocation. The magistrate judge did a global assessment of several things that Jackson did and said and sort of a post hoc assessment of the two interviews and came to the conclusion that he invoked as to the details of the crime. Well, it's true he didn't discuss the details of the crime, but I don't believe there was ever any unambiguous invocation. And even H.E.R.D. requires an unambiguous invocation. Is that really the unambiguous implementation of the right to silence? Is that really what the standard is? Is there a difference? I mean, this is the confusing part, and I ask you, I guess, for your assessment. But when one exercises the right to silence, one terminates the interview by law enforcement. And as a result, if there's a violation of that unambiguous assertion of the right to silence, then suppression of statements follows. Is there a difference in the standard in a Doyle kind of situation, in which you are not talking about the suppression of evidence for a violation of a constitutional principle. You're talking about commentary or commenting on a person's silence. And if that is the case, do you actually have to prove, as a petitioner here, that there was an unambiguous assertion of the right to be silent, if all at issue is the commenting upon your silence? You've pointed out one of the difficulties in this area. It must have been a good question, then, because, oh, my goodness, is that really? Oh, okay. Well, I don't know the answer to it, and I'm interested to see if you see the distinction, and if so, what's the law? I do see the distinction. Frankly, I think it's confusing. Here's what HERD did. HERD cites, I'm not sure if I'm pronouncing it right, Burgess v. Tompkins, which is the standard for cutting off an interview in toto. And they also use the term unambiguous invocation. They say that, and I can't remember what the lead-in is, but that the state has to show an unambiguous invocation or a waiver of those rights, I believe is what they said. So they use the language from Tompkins. Now, the question is, they're borrowing a standard from a Miranda, you know, full-stop case. And what does it mean here? I don't know, especially because in HERD, there was a discreet, very finite request. I will not do that. Here we don't have that. The magistrate judge did a sort of a global assessment, and really the context, I think in this case, what the magistrate did was found that the context of everything was the invocation. It was this broad-based assessment. Back to your question, though, I think that there's some inconsistency there because they do use that test and use the language of that test, that case, I'm sorry. But it didn't cut off the interview entirely. Well, HERD at 1088 says that the silence for a Doyle claim may not require police to end their interrogation. But even if it doesn't do that, even if essentially it's not sufficient under Tompkins to cause the end of the interrogation, it still does not allow prosecutors to use silence as affirmative evidence of guilt. Which said that? What said that? This is in HERD at 1088. To me, that's pretty clearly saying it doesn't have to be as unambiguous as it would be to cut off questioning. Yes. I think that that's the effect, certainly the effect of it. I don't think they had any authority for saying that because Tompkins doesn't say that at all. Well, in Doyle, the defendants, in fact, were talking. They did not invoke, unambiguously invoke their right to silence, so questioning was permitted. And there was no, in fact, the dissent says the defendants were not, they did not invoke the privilege and they were not silent. And yet the court still found that comment on their silence was a violation of their Fifth Amendment right. I'm sorry, did you say that in Doyle they did not invoke? Correct. As the dissent points out, the Doyle and his co-defendant did not invoke the privilege, so they did not cause questioning to stop, and they were not, in fact, silent. They did, in fact, talk to the police just as Jackson did, but what they didn't do was specifically provide their exculpatory version of events, which is then there's no dispute that Jackson never actually answered the question, right. I mean, he talked, but he never actually answered the question about, I mean, the interrogator repeatedly said, please provide your side of the story. Right. Do you agree that Jackson never actually answered that question, provided his side of the story? In fact, that's what the trial prosecutor commented on repeatedly, that he never provided his side of the story. That's correct. He did make several incriminating statements. He essentially admitted he was there. Right. We're not talking about the affirmative statements. We're talking about the ones he didn't make, right, that the prosecutor commented on. Right. Right. With respect, I don't think that's a fair reading of Doyle. The Supreme Court itself, and I cited several decisions, has always consistently described that case as one in which the defendants were advised of their Miranda rights and said nothing. Now, the dissent is the dissent, and he points out that they talked, but that was never part of the opinion or framed the decision. So with respect, I don't think that that's the way that the court intended that to be interpreted. So the question then, if we don't have a situation where they have to stop the discussion, but then he doesn't want to answer certain questions, he's still talkative in this case and wants to be in a different location or maybe have a different individual or be alone, that sort of thing, the question is what about what he doesn't say? And that's what we're kind of focusing on, whether there's this tension between the selective right to silence, which he's invoking now, but the selective right to implicate the selective right to silence where he's not talking. So how does that square with the law in your view? I'm not sure I—I'm sorry, I'm not sure I understood the question. Well, let me just be a little clearer. We have a selective right to silence under H.E.A.R.D. Right. And the question is, well, what does that really mean? Because if we take your proposition is that if it exists, you still have to invoke it, but can you come in and out of it, for example? I see. I don't know the answer to that based on existing law. In H.E.A.R.D., of course, you had this discrete topic and cutoff. I mean, they asked him multiple times, but every time they asked, it was the same thing. No, I won't do that. I do argue that there's an invocation, and H.E.A.R.D. supports that. H.E.A.R.D. says it needs to be unambiguous, and I agree. It apparently doesn't have to be as unambiguous as an invocation to cutoff questioning just by the result of that case, meaning they found an invocation even though it didn't cut off the interview. So what that means or what the standard is is unclear. I do have a quote from Garcia Morales. A suspect who remains silent in response to certain questions may still claim protection under Doyle even if his silence falls short of the unambiguous declaration required to cutoff questioning under Tompkins. I mean, that doesn't answer what standard, but it does suggest that obviously the standard is much less than the cutoff questioning. It does. However, in the context of EDPA, and this sort of gets back into the argument I said I wasn't going to go into, which is that part of the argument is there wasn't clearly established, well, there's no clearly established law supporting this invocation. Let's say, putting H.E.A.R.D. aside, we don't have any clearly established law for that proposition that was stated by the court, and Garcia, I can't remember the case name. The court here in the Court of Appeal opinion says, well, he wasn't silent. What exactly they mean by that is unclear, but I think it could be interpreted also as meaning he didn't invoke. So it does get into the question of what was binding the state court. And while I certainly understand, and H.E.A.R.D. itself is this circuit's law, that something short of a full invocation is okay to invoke, our position is that the only existing, the only extant Supreme Court law is this invocation that cuts off questioning completely. So we're out in this sort of no man's land in the question of invocation. And my argument regarding H.E.A.R.D. is that that was very discreet and distinct, and this isn't. This is more of a vagary. Do you want to address prejudice because you only have two minutes left? I'm sorry. Yes. Let me focus on one point that the magistrate judge didn't address, and that is the fact that he never mentioned self-defense to anyone could not have been missed by the jury. This case, the transcripts of the interviews were presented to the jury as exhibits, and those were played for the jury. Now, I think I've used the term evidence of silence a little loosely in my brief. What I wanted to clarify was the object of the challenge has always been the prosecutor's questioning of Jackson and Cohen, and then the argument, not the transcripts, not the interviews themselves. Those were in and before the jury. The jury could not have missed seeing and making whatever inference they wanted, that there was silence, that there was avoidance, that there was a little attempt to bargain, and so forth. Now, and then coupled with that, what also brought the lack of any mention of self-defense was the proper, the permissible questions that the prosecutor asked of Jackson and Permenter and the defense expert about his failure to mention self-defense to them. Now, my point of that, does this eliminate the effect of any dole? No, but it does greatly diminish the impact of the error, of the error in the questions and argument. The impact of the prosecutor pointing these things out, these were before the jury already. No, she couldn't argue, she shouldn't have argued they could be used as guilt, but there was no instruction, no limiting instruction, no objection to those transcripts. Being in front of them and being used to reach whatever inference the jury wanted, and they were, the question of failing to mention self-defense was presented. Excuse me. To what extent is the weight of the evidence against the petitioner relevant in that analysis of prejudice? Yes. I'm sorry, did you say is it relevant? To what extent is that relevant? Your Honor, I believe it's very relevant. I believe the evidence was strong. I mean, we have a fairly narrow question of guilt. Identity wasn't contested, it's just self-defense. And as I said in my brief, self-defense claim was really implausible in parts and inconsistent with self-defense in other parts. For example, his actions right before he goes out, he goes looking for a confrontation twice, gets his gun, goes out searching for him. He even left the premises to search for Thompson, came back, went out with his gun again. He's looking for a confrontation. He's not looking for what he called a calm resolution. His account of the, and then the post-shooting actions, the consciousness of guilt is overwhelming here. We have, he fled, he threatened the permitter, bitch, better not say my name. He took the only gun, the only item, I'm sorry, that if left alone could have supported his self-defense, and that's what he claimed to be Thompson's gun. He took it. He wiped it down. He buried it. He brought it back. He hid it in his car, left, fled again. It's pretty profound. Never called an ambulance, never called the police. He split as soon as. There was DNA evidence found on the weapon, which came from Thompson, which suggested that that was in fact Thompson's gun, which suggested Thompson had a gun. Yes, it did, Your Honor. My response to that would be it doesn't necessarily mean he brandished it. Where, how Jackson got it, who knows. The problem with Jackson's credibility is he took it and then told the jury, trust me, he had it on him and he was pointing it at me. Well, he destroyed it by taking it, cleaning it, bringing it back, hiding it in his car. He didn't even expect the police to find that. It was hidden under his seat in his car. So, yes, there was evidence linking that to Thompson, but it didn't show that Thompson ever brandished it. He may have just had it on his person or in his car, which was right there, windows down, unlocked in the apartment complex lot. Thank you. Thank you. Before we start, I've got this hearing device here and my hearing aids, and I'm pretty much deaf as opposed to spending too much time around helicopters. If I could beg the Court to lean into its respective microphones, and I'm going to try to go without it. I think I'm going to be okay. And if I say, what, what, what, please bear with me. Okay. We'll try to do that. And then if you need to use the device, we have no problem with that either. Well, yeah. So. Okay. If it pleases the Court, my name is Michael Bigelow, and I represent the petitioner defendant. I think. I think I can answer most of the questions that you've asked. I'm not used to being on this side of the table, to be honest with you. All right. These are the facts of Doyle that everybody seems to ignore. The government ignores it. The cases the government cited that I took exception with, and I took kind of a shorthand exception to it, but the cases the government cites ignores the facts of the case. The facts of the case are the defendant made a statement to the cops. All right. He stopped answering questions. The DA in that case made comments. The Doyle issue is that the Doyle issue is not what the government says it is. The Doyle issue is not a defendant who made no statements. You see it over and over and over again. In Doyle, you read the circuit court cases or the district court cases. This is a case where Doyle is a case where the defendant made no statements, and that's not true. It's not true. But what Doyle did, and Anderson confirms this, Doyle presented the issue as if no one made a statement, as if. It's a legal term. You guys use it. Courts use it. You guys use it all the time. It is as if something wasn't there. It is as if. So we are going to treat this issue as if they did not say anything. They didn't ignore the fact they said something. Doyle did not ignore it. The Supreme Court did not ignore it. The Supreme Court and Anderson did not ignore the fact that those defendants said something and then they were silent. A couple of other cases, Greer v. Miller, U.S. Supreme Court case. U.S. Supreme Court case. Same exact facts as Doyle, with one small exception which I'll mention. Same facts as Doyle. Defendants made a statement to the cops. Then they stopped talking. Well, in Greer, and Greer cites Doyle and goes through all of the machinations, but in Doyle, I mean in Greer rather, there was a single distinct maybe even a question but a comment by the district attorney, and the trial counsel, which did not happen in this case, trial counsel in Greer jumps up and says, objection. And the district court says, you're right, and gives a curative instruction. Well, and so they said, okay, Doyle error but not Doyle error because it was cured. Okay, but it was still a Doyle problem, issue. All right, so in Anderson, the court explained, we explained use of silence for impeachment is fundamentally unfair in Doyle because of the Mirandi warnings. Now, in Doyle, silence was post-Miranda in the face of a question. Silence is an objective fact, an objective fact. It is what it is. It doesn't mean anything. That's what the Supreme Court tells us. It's an insolubly ambiguous objective fact. We don't get to invocation. Doyle says, this is not a case about invocation. We're not invocating the right to remain silent. We're not invocating the Fifth Amendment by a single, not by a single, but by an act of silence, by an objective act of silence. So what do we do in the face of silence? What do we do in the face of silence? Tompkins tells us what we do in the face of silence. So the government, as much as I love the government, is all upset. Well, what are cops supposed to do? I mean, this guy's not talking. What are they supposed to do? Well, Tompkins tells us, the Supreme Court, yeah, Tompkins tells us what we're supposed to do, and what we're supposed to do is keep on asking questions. You got no problem. Cops, officers, you've got no problem. Ask questions. You can do that. If he says something, you're golden. Now, if he unambiguously invocates, then you've got to stop everything, but that's not what this case is all about. Well, let me just, to cut to the chase, he says, I'm not going to say nothing, but then he keeps talking. And then there's this whole kind of almost negotiation about location and about what kind of charge there is, et cetera. So let me just say, is there any other point other than where he says, I'm not going to say nothing at that point, that he says anything about silence or about I don't want to answer any more questions? Well, if he says I'm not going to ask any more questions, that probably would be an invocation of the right to remain silent. But he doesn't say that. He doesn't say that. I'm not going to go there. But that's not the issue. That's not the issue that resolves this case. Now, the fact that Miranda says, and Doyle did not say you have only one opportunity to be silent during an interrogation. Miranda doesn't say you have only one opportunity to remain silent during an interrogation. The Ninth Circuit, in some case, and I'm not sure which one it is, but the Ninth Circuit, in one case, said that guy invoked silence a multitude of times, and the government used that silence to prove insanity. Well, you can't do that. But now we're kind of off this case. So I'm trying to focus on this case where he says that, but then he keeps talking. So would you agree there's no problem with the officers continuing to ask questions? Tompkins says there's no problem. Okay. So we have that there's no problem to ask questions. What I understand your argument to be, then, is if he doesn't answer a question or he doesn't continue talking on some questions, you can't use that against him. Is that right? That's what Doyle tells us. Doyle tells us that the insolubly ambiguous silence cannot be commented on. And where the government's cases go in all of this, they want silence to mean something or to say something. Well, to get to that point, they have to subjectively analyze, and in some cases, some of the government's cases, they do this, subjectively analyze the silence, the Doyle silence. Let's call it Doyle silence. Subjectively analyze the Doyle silence. And they say, well, what he really meant by this, it was a strategic choice on his part, and therefore we can comment on it. And Doyle doesn't say that. Doyle says if he is silent. Does it say if he's silent or if he's unambiguously determined that he wants to be silent? I'm sorry, Your Honor. Say it again, please. Does Doyle say if he's silent as opposed to whether he's unambiguously stated that he wants to be silent? I think in Doyle — I mean, that's where I'm having some collision with the argument you're making, and I don't think it's an easy question, so I'm just trying to unpack it. Your Honor, with all respect, it's a very easy question. Ask me a question. Ask me a question, anything. What's my name? I understand what you're trying to get at. But it would be helpful if you turned around and continued your argument. I'm not answering the question, Your Honor. I'm not asking you a question. I'm asking you or suggesting that just keep going with your argument. It's an objective silence in Doyle's setting is an objective fact. It's objective. It doesn't explain anything, and that's what Doyle picked up on. It doesn't explain anything. It's insolubly ambiguous. Therefore, we don't know what it means. So what do we do about it? Well, if this were a Tompkins situation, the cops can keep asking questions. Well, Doyle says objective silence. District attorneys, you don't get to ask questions on it. I don't care. And where does it go into? Nobody says, well, you only get one shot at it. I got to get to prejudice. So can I just focus you in on the second part of the standards here? And that's the prejudice part. Obviously, there are a lot of cases which then, assuming you establish the violation of Doyle, go to the question as to whether, in fact, that is prejudicial. I'd be interested to know what your standard is to apply to that question. Is it beyond a reasonable doubt? Is it significant impact? That's first. And then, second, try to respond to what appears to be an argument that there are cumulative statements here. In other words, the officers were certain or the prosecutor certainly could introduce statements to witnesses, statements to others that, in fact, the defendant did not claim self-defense. So there's a number of statements that are clearly going to come in. And, in fact, the whole interview is on video. The second interview is on video. All of that comes in. And jurors can actually look at that and say, well, gee, he didn't mention self-defense here. They could arrive at that conclusion. So the question is whether the defendant is, in fact, prejudiced by those comments made by the prosecutor, and in particular in summation, when, in fact, that issue has been addressed to others and came into evidence through others. My answer is going to take longer than two and a half minutes, but I'm going to try. An error is not harmless unless it has a substantial and injurious effect on the influence determining the jury's verdict. The test isn't the sufficiency of the evidence. Now, you talk about the statement, the video stuff that he talks about that comes before the jury, the questions asked of Permenter,  the district attorney in her closing argument does talk about those things, but talks about them ever so briefly. What she drives home, though, is, and something I counted it up, I don't know, I wouldn't say 20 times, but I think that's too much. What she drives home is he's guilty because of his silence. And this court, or the district court at least, had to determine with fair assurance the judgment was not swayed. That's the test. Fair assurance judgment was not swayed. Well, the district court, the magistrate judge, could not say she had grave concern about whether or not the judgment was swayed by error, and that's the standard, and relying on that, she found the error not to be harmless. Yeah, not to be harmless. So you look at the extent of the comments, inference from guilt, silence stressed, and the extent of other evidence. My brief lays out the comments that were made. I mean, it would take for I can read them to you, but I don't have time to do that. The inference of guilt was stressed. Her theme was this guy is guilty because he was silent. That was the theme. She started out with that, and she kept it up. It's not this. That was her theme. Now, the extent of the other evidence and why you can't why Doyle matters is because his credibility was at stake. Now, let's look ever so briefly at Pickett was the main witness. Pickett was the main witness. He said he saw this. He saw that. He saw the other thing. Well, guess what? It was 3 o'clock in the morning. He was watching a porn movie. His pants were down. This is his testimony at about excerpt of record 412, 413. He was preoccupied. The movie was distracting. He first focuses on, well, actually, he doesn't focus. He hears noise, and then he sees flashing, the gun flashes. He doesn't see the shots being fired. He sees the flashing. He was sitting down at his computer. He saw muzzle flashes through closed blinds. Now, he was fully impeachable. And, in fact, if you go to some of the cross-examination, he was impeached by things he said at the preliminary hearing, by things he said to the officers, and the things that he said this time. He even wrote a letter to the effect after the preliminary hearing. And he says he wrote a letter that I may have misstated some things or not perceived stuff, but I've had time to think about it now, and so this is what I really saw. That he says, and the thing that drives everybody nuts on this, actually, he says that I saw him move in to the defendant and stand over him, and at one point, I think he even says, I saw a shot being fired, but I could be wrong on that. No, he, in fact, said that. He said numerous shots. He said numerous shots. He says numerous shots. But the autopsy testimony is consistent with that. And, in fact, there's an autopsy about various shots which really were in the back and into the back of the elbow, which are consistent all with almost an execution kind of firing. But he also says, Pickett also says in his testimony, at ER 434, Jackson was backing up and Tompkins was moving forward. That's at ER 434. Thompson fell back. Now, Pickett says that he saw the guy bending down. Well, I submit to this court that it is just as likely he was bending down to pick up the weapon, to pick up the gun. At some point, he picked up that gun, and that's where the DNA came from, that the guy actually had a gun. What's your name? Permitter, who knows this guy, testified that he was violent. Sort of testified, but that was the impression. She also testified, though, and it's all in about the same ER section. But he never told her that there was an assault or a self-defense, right? He testified that he knew that. He testified that he was aware of this guy's, and that's ambiguous, Your Honor. That's correct. Well, no. The answer is he never said that. He testified. To Permitter. Or Perminter, I guess is the word. Perminter never said that to him? No, he never said it to Perminter. Anything about self-defense? Anything about self-defense. That seemed pretty clear from the record. Well, that's the way the record is spun. But if you read deeper into the testimony. Well, do you have a citation we should look at to confirm that? I'm happy to go back and look for sure. Yes, no, that's correct. He did not say anything to her. But let's look at the facts to understand. Well, why don't you wrap it up? Because we've given you quite a bit of extra time already. So if you want to summarize, unless there's specific questions. Can I just answer that little loop? In fact, you should put what exactly your client theoretically said, or what the evidence suggests, he said to Perminter, and that is he threatened her not to give up any names. He said, don't give my name up. He said, don't give my name up. But Thompson comes running up the stairs, and as I read the transcript, and it's all about ER 352, Tompkins was jealous, left voice messages. He comes running up the stairs. Defendant, my client, comes running up the stairs too, and he's only there for a second and a half. He's only there for a short period of time because Thompson is up there. He's up there, and then he turns around and leaves. Jackson turns around and leaves. That is not nearly as powerful as the incessant driving of the district attorney saying he was silent, he's guilty, silent, he's guilty, silent, he's guilty. You didn't say this, he's guilty. The other stuff, if you read the closing arguments in this case, and the rebuttal argument from the prosecutor, she doesn't stress. She mentions it, but only in passing. Only in passing does she mention the other stuff. He didn't say this to Permeter. He didn't say this to the investigator. He didn't say this, and you've given me more than enough time. I appreciate it. I think we do have your argument in mind, and, of course, we go over the transcripts quite carefully, and you've drawn our attention to some specific things. So thank you for your argument. Thank you, Your Honor. We've given you quite a bit of extra time, so we'll put somewhat less than that for rebuttal, two minutes for rebuttal for the government. Thank you. Sorry, I am not used to being on this side, and I did not request time, so thank you. It's a role reversal here. We appreciate it on both sides. I did want to clarify something, because I misspoke or erroneously described Herd when I said that they sort of quoted the standard. What they said was once they found that there was clearly established support or protection for selective silence, they said so. That requires the government to establish that he either waived his right or never effectively invoked it. But thereafter, they cite Tompkins and use unambiguous and objectively unambiguous, which is the language from Tompkins. So sorry for that bit of confusion. Just a couple of quick points. In terms of what the meaning or the scaffolding of Doyle and whether the defendants there spoke, my point is just that whatever happened, it's always been framed as a case in which it was cut off and they didn't talk. Now, it was a little unclear to me. I don't know if counsel is arguing that Herd, that silence alone is protected without an invocation. If so, my response is no. Herd itself requires an invocation very expressly. I don't know if that. I don't want to misrepresent what was being argued. But to the extent that is being argued, Herd answers that. Well, in Herd, I believe they say that the defendant just needs to either refuse to answer the question or just be silent or refuse to answer the question. They can even talk and explain why they're refusing to answer the question. Which case, Herd? In Herd. They said he doesn't need to invoke? They can just be silent or they can say they're refusing to answer the question and explain why. At 1089, they reject the argument that the refusal was not actually a refusal because he offered explanations instead of simply saying no. They also say somewhere that they can be just silent. They can just refuse to answer the question. Okay. I believe you. My response to that would be I'm not aware of that and that the holding of Herd rests on unambiguous invocations, which were clear as to a refusal and as to the topic. So I suppose that's dicta. If that were the case, if he didn't need to say anything, it seems like they wouldn't have needed to go into the whole bit about him invoking and unambiguously invoking. And then going back to clearly established, I would say there's no clearly established for, well, we're kind of out in the weeds anyway on this, but certainly none for invoking protections without saying something that indicates you want those protections. Well, I think they say that he just, in Herd, they say that he unambiguously refused to answer the question and that it was his refusal to do something that the prosecutor argued would create an inference that he was guilty or not telling the truth. Isn't that exactly what happened here? I mean, the prosecutor says over and over again that the interrogating officer asked Jackson to tell his side of the story. The prosecutor, in her own description, says Jackson refused. Jackson didn't tell his side of the story. Jackson repeatedly, I mean, I don't know why the interrogating officer would repeat the same question over and over again, tell me your side of the story, if he didn't understand that Jackson had never, in fact, agreed to tell his side of the story. And then his refusal to tell his side of the story is what the prosecutor says creates the inference of guilt. So you're saying that's not a Doyle violation? In the one in Herd or the one here? Either way. Well, in Herd, he did, in fact, refuse. Jackson never, in fact, refused, despite what the prosecutor's argument is. She's saying he didn't do it. And I think there's a difference. There's just no affirmative statement. He simply just doesn't answer or he avoids or he keeps trying to sort of haggle something with the officer. Now, as far as what the officer understood, I agree. He keeps trying at him. And there's authority for, well, the context. Let me back up. The reason for an unambiguous invocation is for clarity for the police. But it's never been a substitute for invocation. And I think here, because if you've got a defendant who just keeps talking, I think that makes it unclear to this officer. It leads him to think that maybe he is going to talk. He says he's going to talk. He says he's going to talk in Fairfield. And, again, waves and talks. He just doesn't talk about the details. Do you have more questions? I have one more question. In Doyle, the court quoted Justice White's concurrence in United States v. Hale and said, it does not comport with due process to permit the prosecution during the trial to call attention to the defendant's silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told, he need not do, that an unfavorable inference might be drawn as to the truth of his trial testimony. I mean, is that not exactly what is happening here? It was his omission. It was his decision, Jackson's decision, not to speak about the facts of the case, that the prosecutor said must mean he's lying now at trial. That was her argument. Was it not? Yes. My distinction, which I've made in the briefs, is that in Doyle, you've got to, whether they invoked it or just stopped talking completely, you have a bright line cut off. Here, there is a waiver. There's two waivers. You get two interviews waived and talked. It's just factually distinct. But we're never in a Doyle situation if there has been a clear invocation of the right to silence, right? Because if there's a clear and unambiguous invocation of the right to silence, interrogation has to stop, doesn't it? Well, that's what we were discussing with Judge Sessions is there's an invocation required. What the standard is is unclear. You're right. Well, funny, Hurd uses the term he unambiguously invoked, but they don't suggest that it cut off. They just said that protected those denials. So we've got this language that seems to mean two different things maybe in two different contexts. I don't know the answer to that because we're just outside of, frankly, Supreme Court law, and I don't want to get back into my clearly established, but I don't know the answer to that. But there does seem to be this language means one thing here and one thing another. I don't know the answer. Sorry. Any other questions? No. I thank both counsel for your arguments today and also for the briefing. Jackson v. Clark is submitted and we're adjourned. Thank you. All rise. This court for this session stands adjourned. Thank you.
judges: McKEOWN, SUNG, Sessions